Filed 8/18/22  Miller v. Bernie CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHARLES A. MILLER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>KEVIN F. BERNIE,<br><br>Defendant and Respondent. | F080064<br><br>(Kings Super. Ct. No. 12C0112)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Kathy Ciuffini, Judge.

Charles A. Miller, in pro. per., for Plaintiff and Appellant.

Scampini, Mortara & Harris, Haig A. Harris, Jr., and Neil S. Turner for Defendant and Respondent.

-ooOoo-

Charles Anderson Miller appeals after he was designated as a vexatious litigant who was unlikely to prevail on the merits of his lawsuit and had his case dismissed when he could not post the required security ordered by the trial court. (Code Civ. Proc., § 391.3.)[1] In addition, Miller appeals following the trial court's decision to issue a prefiling order against him. (§ 391.7.) For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The litigation underlying this case has been proceeding for more than a decade and has undergone multiple appeals. We recount facts relevant to the issues before us in this appeal.

*The Complaint and Entry of Default*

On June 4, 2012, Miller filed a first amended complaint in his civil action against Kevin F. Bernie.[2] The complaint requested more than $2 million in damages based on an attached letter purporting to concede the amount owed was a debt resulting from a prior loan from Miller to Bernie and unpaid wages from work Miller had done for Bernie. The June 17, 2010 letter broke down the debt as consisting of $1.7 million that was allegedly borrowed in 2008, $48,000 for paralegal work "on the Mitchell vs. Alexander case," and $12,500 for paralegal work "performed on behalf of Lolonis Winery, Inc." through June 2008, along with interest. Repeatedly referenced in the letter was an alleged phone conversation on June 15, 2010, in which these promises were purportedly made and which the letter indicated "were no doubt also recorded by the [Department of Corrections and Rehabilitation] prison security telephone system."

On August 22, 2012, Miller filed a case management statement asserting that Bernie had been served with the amended complaint but had not appeared. Included with the filing were documents suggesting that one Patti Rodrigues had signed for a document

[1] All future statutory references are to the Code of Civil Procedure, unless otherwise noted.
[2] The original complaint, containing substantially similar factual assertions, was filed March 12, 2012.

2.

mailed to Bernie in Hawaii on June 27, 2012, and an assertion by Miller that he had requested an entry of default on August 3, 2012, but the document had been "delayed/refused" by the court clerk. Also attached was a rejection slip from the superior court noting Miller's "default and proof of service are being returned to you unfiled: Your Notice of Acknowledgment of Receipt must have a date of signature. We cannot accept as is."

On September 14, 2012, Miller filed both a proof of service and a request for entry of default. The six-page proof of service was signed by one Sergey Lazarenko of Novato, California and included an extensively detailed description of how he purportedly served someone named "CYNDY" who was living at Bernie's condominium in Walnut Creek, California. Lazarenko described Cyndy as an adult female "50+" years of age, with "sandy-blonde hair, green eyes, about 135 LBS in weight, and 5'7" in height [*sic*]." In his description of his attempts at service, Lazarenko asserted that Cyndy had repeatedly avoided accepting service, made several rude and crude comments in the course of his attempts, and after being served, dropped the papers on the floor, claimed she could not accept service, and refused to pick them up even as Lazarenko was leaving. The document appears to have been filled out with a typewriter, utilizing multiple fonts, and contains multiple legal citations in support of claims the service was proper. The request for entry of default was also purportedly mailed to Bernie at the same condominium on September 12, 2012, by Sean McCarthy, a prison inmate.

Shortly thereafter, on September 18, 2012, Miller filed an amended case management statement again noting his desire to obtain a default entry. In this filing, Miller noted he had twice filed proofs of service and requests for default, and that the second set had been accepted. Subsequently, a hearing was set for the prove up of damages.

Prior to the hearing, Miller submitted a lengthy declaration from one Kathleen Marie Stevens, which purported to affirm the signature of Bernie on the letter supporting

3.

Miller's claims. In her declaration, Stevens claimed to have been a former girlfriend of Bernie but conceded he had obtained a restraining order against her. She claimed the letter was authentic, but noted it was on Bernie's "old" letterhead. She also conceded, in discussing her claimed knowledge of the $1.7 million loan, that certain documents claiming to show Miller's interest in a company that money had been invested in were "fabricated and/or fictitious."

Miller also submitted his own declaration. In it he explained he had been a paralegal and had worked for Bernie before he had been convicted and sentenced to a life term under California's "Three Strikes" law in 1998. He claims to have continued doing paralegal work through 2009, "with knowledge of [Department of Corrections and Rehabilitation] prison officials," and attached billing statements and checks written by Bernie to pay for some of those services, while detailing work occurring around 2006 to 2008. Miller further stated he had previously invested in a partnership and had been bought out from that group in 2008 for $1.7 million, which funds he then entrusted to Bernie to loan to Lolonis Winery. Miller acknowledged that an escrow closing statement allegedly sent to him by a prior business partner and showing this investment "later proved to be a fabrication." Miller ultimately claimed the investment was never made, but rather that Bernie kept the funds.

On December 11, 2012, the trial court issued its judgment after default hearing. The trial court recounted the facts supporting the lawsuit, noting both that the "Escrow Closing Statement" Miller claimed to have received was an acknowledged fabrication and that Miller had previously filed a lawsuit in 2009 over the $48,000 paralegal fees that had been dismissed. Relying on the letter submitted by Miller and his declaration, the trial court entered a default judgment in the amount of $2,105,196.80.

*Set Aside of Default and First Appeal*

Shortly after the entry of default, Bernie moved to set aside the judgment on grounds of fraud and a lack of notice. Bernie argued that service in the case was part of

4.

one extensive attempt to fraudulently obtain a default judgment. He alleged he had no knowledge of the lawsuit until his brother informed him on November 25, 2012, that papers about the default judgment had been sent to the brother's house. Bernie further disputed many aspects of the proof of service on Cyndy, noting that the condominium complex he resides in does not match the descriptions given in several material ways, including with respect to how parking spaces were numbered, how people would enter the building, and the names of potential people residing in the building. And Bernie asserted that no documents relating to the lawsuit had arrived at any of his properties prior to his brother contacting him, despite several filings and notices allegedly being sent there. Finally, Bernie submitted multiple declarations in support of his request.

One declaration came from Rodrigues concerning the first attempt at service. Rodrigues worked as a reservationist at the complex where Bernie owns a condominium. She stated she had received multiple calls asking if Bernie was present in Hawaii and told the caller he had not been to that location in "quite some time." The caller insisted Bernie would arrive soon and asked if they could mail him something here. Rodrigues stated that was possible, and later signed for an envelope "decorated in stickers and glitter of whales, fish and shells," which she then placed in a filing cabinet and left unopened until November 26, 2012, when Bernie asked whether anything had been accepted for him at that location.

Another declaration came from Cynthia Simoncini, the person alleged to be Cyndy in the Lazarenko proof of service. Simoncini stated she had never gone by "Cyndy" but had been known as Candy. She admitted to living with Bernie at the time service was alleged but denied being served or meeting with Lazarenko at any point. Simoncini stated she would have provided Bernie with any documents served on her as she knew he was a lawyer and insisted she would never speak to a stranger in the terms Lazarenko had described. Simoncini noted that the physical description given of her by Lazarenko did not match her height or weight. Finally, Simoncini explained she had met Stevens,

5.

whom she called Miller's fiancée, previously when Bernie was seeking a restraining order and speculated Stevens had provided Miller with a description of her.

On February 22, 2013, following a hearing, the trial court set aside the default. The trial court wrote that it found "Simoncini's declaration credible" and that "if she had been served with the paperwork she would have given the paperwork" to Bernie. The court also found "it unusual that the proof of service is single spaced and fairly controversial with reference to a proof of service with unnecessary detail." Based on these findings, the trial court concluded there was no "actual knowledge by … Bernie of the summons and complaint in time to defend this action."

On April 2, 2013, Miller appealed the trial court's order to this court. In an unpublished opinion dated October 10, 2014, this court affirmed the trial court's ruling. (*Miller v. Bernie*, Oct. 14, 2014, F067619.) This court wrote that while there was conflicting evidence in the record, the trial court made a credibility finding that Bernie lacked notice of the lawsuit and that there "was competent evidence sufficient to support the trial court's finding."

*Discovery, Dismissal, and Second Appeal*

Upon remand, the case proceeded to pretrial matters and discovery. Relevant to this appeal, Miller filed three discovery motions that were denied by the trial court.

The first motion, filed ex parte, sought to name Stevens as a "legal runner, Assistant, and/or legal non-attorney representative," purportedly to assist Miller with the litigation. Stevens, who had since married Miller, was requested under the premise that pro se attorneys could name individuals who were authorized to visit them to serve as their legal runners under the applicable regulations.

The second motion sought an order to compel further compliance with a subpoena issued to the Department of Corrections and Rehabilitation (CDCR) to produce recordings of telephone conversations relating to Miller. In this motion, Miller acknowledged that the relevant recordings had been provided to him in a format that

6.

required a computer to access. Noting that he could only possess a CD player, Miller requested the recordings be reformatted and reproduced to him in a "useable" format.

The third motion sought an order compelling further compliance with a subpoena issued to the CDCR through Pleasant Valley State Prison to produce visitor logs relating to Miller. In response to Miller's initial subpoena for such records, the CDCR provided a declaration from a custodian of records stating that they did not maintain those specific records. Miller argued this statement contradicted written policies on where the documents should be stored and noted he had seen portions of the records in the possession of a different officer.

The trial court denied each of these motions after holding a hearing on each. On the first motion, the court's confirmed at the outset that the CDCR was not a party to the lawsuit and thus could only be compelled to act by mandamus. Miller, often overtalking the court, then conceded the case law did not permit the court to appoint his wife as a legal runner with respect to the CDCR. The court then explained to Miller that he would need to go through the normal prison-side procedures to have a legal runner appointed. In further discussions, it became clear that the normal process for appointing a runner could take several months, and Miller wanted an advisory opinion from the court that could assist with having Stevens appointed by the prison. The trial court refused to do this.

The trial court heard the second and third motions at the same time. It denied the second motion writing that "EIS[, the custodian of record for the CDCR,] already fulfilled its legal obligation by producing the telephone call records in the form in which they are ordinarily maintained and in a form that is reasonably useable, and EIS cannot reproduce the recordings in the format requested by Miller." The court denied the third motion noting "Pleasant Valley State Prison is not the proper custodian of records for Miller's visiting records." At the hearings on these motions, the CDCR explained to the court that the visitor log files would be kept at Miller's current prison, that no regulation

7.

required them to be kept where Miller argued they were, that the CDCR would work with Miller to help him understand who to ask for the records, that they had produced the audio files in the format they were kept, and that they had no software that would convert the files to another format. The court accepted these representations in denying the motions.

In addition to the proceedings on these motions, Bernie sought to dismiss the action against him on the ground the trial court could not permit the action to proceed unless it determined the lawsuit was a bona fide action. The trial court ultimately granted this motion, dismissing Miller's action, and Miller appealed.

In an unpublished opinion, this court reversed the dismissal. (*Miller v. Bernie*, June 15, 2018, F073153.) In the course of the opinion, this court recounted many of the facts presented by both sides regarding the case, noting Miller's claims that he had not been paid for paralegal work and had loaned Bernie an alleged $1.7 million that had been improperly diverted, along with Bernie's claims that all of the relevant documents regarding the purported loan were fabricated and that the paralegal work claims were barred both by statute of limitation and regulatory hurdles. This court then looked at the nature of Bernie's motion to dismiss, lacking in any statutory authority, and determined it was an improper speaking motion to dismiss, a form of motion that had been statutorily eliminated by the summary judgment statutes.

Having reached this conclusion, this court explained that the appeal exemplified the reasons for the current summary judgment proceedings, focusing on the limited briefing schedule and the deluge of evidence presented to the trial court in the course of the motion. Concluding that the record contained "triable issues of material fact" and that Bernie "did not follow the proper procedures for bringing a motion for summary judgment," which is how it should have treated the motion to dismiss, this court reversed the order dismissing the action.

Following this conclusion, the opinion extensively considered whether the rules are different for a prisoner-plaintiff. Reviewing the case law, this court found there were some circumstances where an indigent prisoner-plaintiff may be required to demonstrate the existence of a bona fide action in order to obtain supplemental services necessary to ensure access to the courts. However, such circumstances would not warrant a minitrial on the plaintiff's evidence but would focus upon the evidence presented in the light most favorable to the plaintiff. Finally, this court dismissed the argument the court could dismiss the action as frivolous because that argument had not been properly raised in the briefing or raised below.

*Remittitur and Cost Motions*

Given the trial court's order dismissing the case was reversed, the matter was remanded to the trial court for further proceedings. On June 26, 2018, the trial court entered a notice of hearing after remittitur, scheduling the hearing for August 6, 2018. In response, Miller attempted to file a memorandum of costs related to the costs awarded to him in the prior appeal. This filing, however, was rejected based on a faulty proof of service. On July 24, 2018, Bernie filed a motion to strike Miller's request for costs, arguing the request was prematurely filed. On July 30, 2018, the court vacated the scheduled hearing after remittitur, noting it was prematurely set in error. On August 30, 2018, the remittitur issued, and a new hearing was scheduled for September 21, 2018. Shortly thereafter, on September 10, 2018, the trial court granted Bernie's motion to strike the costs filing that had been rejected by the clerk's office. The order shows that Miller did not appear for the telephonic hearing which occurred on August 21, 2018, prior to the remittitur issuing.

Separately, on or around September 1, 2018, Miller filed a memorandum of costs, seeking $6,313.83 in appellate costs. Bernie filed motions to tax the requested costs on the ground Miller did not actually incur the majority of them and to apply any award to a lien Bernie held against Miller. Following a hearing, the trial court struck all but $593.60

9.

associated with "the preparation of the relevant reporter's transcript" and granted the motion to apply that sum against the lien.

*The Vexatious Litigant Motions, Rulings, and Present Appeal*

On May 6, 2019, Bernie filed two related motions seeking to have the court declare Miller a vexatious litigant, determine he had no reasonable probability of success on the merits, and order Miller post a security to proceed. Bernie's argument focused on the litigation history detailed above, contending Miller frivolously attempted to obtain a default judgment through improper service, fabricated documents, and pursued an unmeritorious appeal, before engaging in unmeritorious and frivolous discovery proceedings, and ultimately filing unmeritorious and frivolous costs requests. Miller opposed the request. Following a hearing, the trial court granted Bernie's motions.

The trial court's written order determined that Miller qualified as a vexatious litigant under section 391, subdivision (b)(3). The court reached this determination by concluding Miller had "filed eight frivolous motions, pleadings and other papers without colorable merit." The court stated these filings were "frivolous based on fabricated proofs of service, and litigation tactics, for ulterior motives to defraud and harass Mr. Bernie and/or the [CDCR]." The court then looked at the eight filings individually. On the first, the court found Miller filed a "case management conference statement and asked for an entry of a default judgment based on a defective proof of service" to "fraudulently later obtain a default judgment." The court found this frivolous because the service was purportedly made in Hawaii "while Mr. Miller knew that [Bernie] did not live in Hawaii, as shown through deceptive phone calls to a reservationist .…" The second, the fabricated proof of service, was a filing the court called "a glaring fabrication" and "a key pin to the lawsuit." The court specifically noted its conclusion that "Miller fabricated this proof of service" in part because of the unique nature of the proof of service and the court's conclusion "that the font on that proof of service appeared to be from Mr. Miller's

10.

typewriter." Similarly, the court considered Miller's pursuit of the first appeal to be part of this fraudulent service of process issue.

The fourth, fifth, and sixth filings were the three discovery motions following the first appeal. The court called the request for a legal runner to be "unmeritorious and frivolous" in part "because [Miller] knew the Court had no personal jurisdiction over the CDCR due to his failure to serve a subpoena or Writ of Mandate." The court called both the request for phone records and the request for visitation records "unmeritorious" because "the code relating to record production is quite clear with respect to the form in which those recordings would be produced" and because "the custodian stated under oath that he did not have those visitation records in his possession."

The seventh and eighth filings were the two cost requests. The court called the first "unmeritorious" because it was "premature in that it was filed prior to the issuance of the remittitur" and resulted in "Bernie having to defend that." The eighth was found "unmeritorious" based on the large difference between the costs requested and those awarded.

Having determined Miller to be a vexatious litigant, the trial court next determined there was "no reasonable possibility" that Miller would prevail in the action against Bernie. The court noted it was permitted to weigh the evidence in the case when making this determination before identifying three reasons why the case was not likely to be successful. Two of the reasons for the court's findings were based on procedural hurdles. First, the trial court concluded Miller's claims were likely barred by the statute of limitations. The court noted the alleged paralegal work was completed in 2005 and 2006, but the complaint was not filed until 2012, well beyond the four-year statute of limitations for oral or written contracts. Second, the court found that Miller was a prisoner at the time of the alleged work and thus was barred from enforcing any agreement for payment under section 3924, subdivision (a) of Title 15 of the California

Code of Regulations, which requires permission from the warden for any inmate to perform paid work.

The third reason was more substantive. Extensively discussing the evidence it relied upon, the trial court concluded that "the documents underlying the lawsuit" were "fabricated." Looking at key evidence supporting Miller's claims, the court found many problems. First, it concluded the key evidence supporting Miller's claim, a letter purportedly sent from Bernie to Miller on June 17, 2010, was "a forgery." The court noted that the letter referenced a June 15, 2010 phone call and that subpoenaed records from that date included one 14-minute phone call from that date. However, the transcript of that call contained no discussion of any debt owed to Miller regarding paralegal fees. The court further noted that a forensic examiner had examined the letter memorializing the purported June 15, 2010 call and, as the court put it, "He didn't state it in those terms, but the Court has made an inference based on his statement and his findings that the letter, in fact, was a forgery."[3] Continuing on, the court found the "envelope that Mr. Miller allegedly received the letter in was, in fact, an envelope that Mr. Miller received from Lolonis Winery containing a book of stamps and regular envelopes."[4] Wrapping up the forgery analysis, the court expressed its view that the "forgery is very apparent when

---

[3] The actual declaration from the examiner in the record, who looked at several signatures for comparison, states the signature on the letter "pictorially resembles some of the obvious handwriting features that are present in the K-1 through K-12 genuine signatures of Kevin F. Bernie; However, any real similarity ends there." The examiner continues by stating, "[T]here are numerous differences present between the questioned and known signatures which strongly indicate that the writer of the questioned signature made an effort to imitate the obvious uppercase 'K' and uppercase 'F,' which were carelessly simulated." The examiner concludes, "[T]here still is sufficient evidence present for me to positively conclude that the questioned signature is not the normal or genuine signature of Keven F. Bernie when compared with the K-1 through K-12 signatures. Rather, there was an attempt by an individual to imitate the genuine signature of Kevin F. Bernie."

[4] This was based on declarations submitted to the court explaining Lolonis Winery would often send such envelopes to Miller and additional phone recordings from June 17, 2010, where Miller asked for a book of stamps and regular envelopes.

12.

compared to the proof of service with respect to the service of Mr. Bernie. And that is the proof of service allegedly authored by Sergey Lazarenko, which was used in support of a default judgment."

The court then briefly looked at the possibility Miller had loaned $1.7 million to Bernie. The court noted it "proved out to be that [Miller] did not have the $1.7 million." The court pointed to Miller's admission that the escrow statement suggesting he had the money was an admitted forgery and that phone records were subpoenaed from Pleasant Valley State Prison which showed "there was never a telephone conversation with Lolonis Winery about Mr. Miller investing in this partnership of Lolonis Winery and receiving $1.7 million from Mr. Miller."

Based on these findings the court ordered Miller to post a security in the amount of $265,000 to proceed with the litigation.[5] In addition, at the hearing on these motions, the court stated it was "going to issue a prefiling order under … 391.7." This order was entered March 3, 2020. Miller did not pay the required security and his case was eventually dismissed.

Miller timely appealed the order declaring him a vexatious litigant and requiring he provide security to proceed. We construe that notice to also include the prefiling order, which was ordered prior to the appeal, but not entered until after, and was part of Miller's previously granted request to file this litigation as required under the vexatious litigant statutes.

## DISCUSSION

### *Basis for the Vexatious Litigant Statutes*

There are various permeations of the explanation for California's vexatious litigant statutory scheme. Our Supreme Court has explained that "[t]he vexatious litigant statutes (§§ 391–391.7) are designed to curb misuse of the court system by those persistent and

---

[5] Miller has dropped any argument the amount of the security was an abuse of discretion, a point upon which we reach no conclusions.

13.

obsessive litigants who, repeatedly litigating the same issues through groundless actions, waste the time and resources of the court system and other litigants." (*Shalant v. Girardi* (2011) 51 Cal.4th 1164, 1169 (*Shalant*).) Another court recounted: " ' "The purpose of the statutory scheme is to deal with the problem created by the persistent and obsessive litigant who has constantly pending a number of groundless actions, often against the judges or other court officers who decide or were concerned in the decisions of previous actions adversely to him." ' " (*Golin v. Allenby* (2010) 190 Cal.App.4th 616, 634 (*Golin*).) Curbing such abuses was deemed necessary because such " ' "abuse of the system not only wastes court time and resources but also prejudices other parties waiting their turn before the courts." ' " (*Id.* at p. 635.) " 'Since fewer sanctions are available against a *pro per* litigant, the power to declare him vexatious becomes an important tool for the courts to manage their dockets and prevent frivolous claims.' " (*Shalant*, *supra*, 51 Cal.4th at p. 1176.)

The statutes contain "two distinct and complementary sets of remedies. In *pending* litigation, a defendant may have the plaintiff declared a vexatious litigant and, if the plaintiff has no reasonable probability of prevailing, ordered to furnish security. If the plaintiff fails to furnish the security, the action will be dismissed. [Citation.] In addition, a potential defendant may prevent the vexatious litigant plaintiff from filing any *new* litigation in propria persona by obtaining a prefiling order and, if any new litigation is inadvertently permitted to be filed in propria persona without the presiding judge's permission, may then obtain its dismissal." (*Shalant*, *supra*, 51 Cal.4th at p. 1171, italics added.)

The first remedy arises out of sections 391.1 through 391.6, while the second arises out of section 391.7. Both remedies share the foundational requirement of identifying a vexatious litigant if the court is to implement them. Under section 391.1, any motion seeking an order requiring security to proceed "shall be based upon the ground, and supported by a showing, that the plaintiff is a vexatious litigant and that there

14.

is not a reasonable probability that he or she will prevail in the litigation against the moving defendant." Under section 391.7, "[i]n addition to any other relief provided" in the statutory scheme, the court may "enter a prefiling order which prohibits a vexatious litigant from filing any new litigation in the courts of this state in propria persona without first obtaining leave of the presiding justice or presiding judge of the court where the litigation is proposed to be filed." (§ 391.7, subd. (a).)

***Standard of Review and Applicable Law***

A vexatious litigant is defined as one satisfying one of four tests, of which only the third is applicable to this case. Under that test, a vexatious litigant is one who "[i]n any litigation while acting in propria persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay." (§ 391, subd. (b)(3).) This test has been considered disjunctive by prior courts, looking at whether the plaintiff satisfied any of the listed courses of conduct individually, either by repeatedly filing unmeritorious motions, by conducting unnecessary discovery, or by engaging in frivolous litigation tactics. (*Golin*, *supra*, 190 Cal.App.4th at pp. 638–639.) The term "repeatedly" has been construed to refer "to a past pattern or practice on the part of the litigant that carries the risk of repetition in the case at hand." (*Holcomb v. U.S. Bank Nat. Assn.* (2005) 129 Cal.App.4th 1494, 1505 (*Holcomb*).) The term "frivolous" has been construed to include actions " '(A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party' " as well as "a ' " 'flagrant abuse of the system,' " ' having ' "no reasonable probability of success," ' or lacking ' "reasonable or probable cause or excuse." ' " (*Golin*, *supra*, 190 Cal.App.4th at p. 639, fn. 29.)

"At the hearing upon the motion the court shall consider any evidence, written or oral, by witnesses or affidavit, as may be material to the ground of the motion." (§ 391.2.) "When considering a motion to declare a litigant vexatious, the court must weigh the evidence to decide whether the litigant is vexatious based on the statutory

15.

criteria and whether the litigant has a reasonable probability of prevailing." (*Goodrich v. Sierra Vista Regional Medical Center* (2016) 246 Cal.App.4th 1260, 1265 (*Goodrich*).) The "normative conclusion that, in any litigation, the plaintiff has engaged in 'unnecessary' discovery or 'other tactics that are frivolous or solely intended to cause unnecessary delay' " is an evaluative function that requires the trial court to weigh the evidence. (*Moran v. Murtaugh Miller Meyer & Nelson, LLP* (2007) 40 Cal.4th 780, 786 (*Moran*).) Where evidence on the relevant issues is conflicting, " ' "It is for the trial court to weigh the evidence and its finding, based upon substantial conflicting evidence, is in this as in every civil case binding upon the appellate court." ' " (*Id.* at pp. 784–785.) Of course, "[a]ny determination that a litigant is vexatious must comport with the intent and spirit of the vexatious litigant statute.… Therefore, to find that a litigant is vexatious, the trial court must conclude that the litigant[']s actions are unreasonably impacting the objects of [the] appellant's actions and the courts as contemplated by the statute." (*Morton v. Wagner* (2007) 156 Cal.App.4th 973, 970–971 (*Morton*).)

Accordingly, we "review the trial court's order declaring a party to be a vexatious litigant for substantial evidence. [Citation.] We are required to presume the order declaring a litigant vexatious is correct and imply findings necessary to support that designation. [Citation.] A reversal is required only where there is no substantial evidence to imply findings in support of the vexatious litigant designation." (*Goodrich*, *supra*, 246 Cal.App.4th at pp. 1265–1266.) "Likewise, a court's decision that a vexatious litigant does not have a reasonable chance of success in the action is based on an evaluative judgment in which the court weighs the evidence. If there is any substantial evidence to support the court's determination, it will be upheld." (*Golin*, *supra*, 190 Cal.App.4th at p. 636.)

***Substantial Evidence Supports the Vexatious Litigant Finding***

The trial court's order in this case determined Miller was a vexatious litigant under section 391, subdivision (b)(3) based on the fact he had "filed eight frivolous motions,

16.

pleadings and other papers without colorable merit." The court found these filings frivolous or meritless "based on fabricated proofs of service, and litigation tactics, for ulterior motives to defraud and harass .…"

Miller spends significant effort breaking apart the various filings discussed by the trial court and attempting to demonstrate that there is no substantial evidence on an individual basis to conclude that any filings were frivolous or otherwise filed for an improper purpose. We do not agree. Indeed, upon review of the record, we conclude there is more than enough evidence for the trial court to determine Miller engaged in frivolous litigation tactics, specifically through the use of fraudulent service documents to obtain a default judgment. Miller's arguments to the contrary generally seek to impose additional burdens on Bernie and the trial court to specifically prove Miller's intent on a filing-by-filing basis or have this court weigh the evidence submitted independently and agree with Miller that it does not demonstrate an intent to "harass, annoy, burden financially, or cause undue distress" to Bernie.[6] But there is no basis for this court to do so. The statutory scheme permits a global finding of vexatious litigation tactics that does not turn on "individual unmeritorious filings." (*Golin*, *supra*, 190 Cal.App.4th at p. 639.) It is this global analysis that we review when considering whether substantial evidence supports the trial court's ruling.

Looking at the record, we conclude substantial evidence exists upon which the trial court could conclude that Miller fabricated the Lazarenko proof of service and failed to inform Bernie of the lawsuit against him until after a default judgment was entered. On this point, Bernie submitted declarations from himself and Simoncini regarding notice of the lawsuit and the allegations made in the Lazarenko proof of service. In setting aside

---

[6]     Because this court affirms the trial court's finding on the basis of frivolous tactics, we need not specifically reach the alternative potential bases of multiple unmeritorious filings or unnecessary discovery. We specifically note in this context that our conclusion here does not touch on whether Miller's cost filings constitute an independent basis for the trial court's rulings.

the default, the trial court specifically concluded that Simoncini's declaration that she had not, in fact, been served in the case was credible. Further, additional evidence in the form of contradictions between statements made by Lazarenko about the building and people he encountered in the declaration and the actual facts regarding the building and the people present at the site as detailed in Bernie's declaration support the conclusion that Simoncini was not actually served.

That Miller's actions were part of a broader frivolous litigation tactic is then further supported by the declaration submitted by Rodrigues detailing the deceptive attempt to serve Bernie in Hawaii. Although Miller contends that his later filing of case management conference statements cannot support the vexatious litigant finding because Bernie had not yet appeared and the filings were required by court rules, it is not the just the filings that are relevant but also the underlying actions in attempting to serve Bernie in a location he was not residing and through potentially deceptive phone calls and mailings in order to seek a default. The court could readily rely on these record facts to conclude Miller's actions were frivolous, as fraudulent proofs of service "qualify as substantial evidence of frivolous tactics in that such conduct is a flagrant abuse of the system." (*Golin*, *supra*, 190 Cal.App.4th at p. 640.) That Miller then pursued his improperly obtained default judgment through an appeal and lost further solidifies the trial court's implied conclusion that Miller was acting in a manner that warranted application of the vexatious litigant statutes because he was "unreasonably impacting the objects of [Miller]'s actions and the courts as contemplated by the statute." (*Morton*, *supra*, 156 Cal.App.4th at p. 971.)

Miller contends on appeal that Bernie waived any right to seek relief under the vexatious litigant statutes by waiting until this case had proceeded for many years, and through multiple appeals, to raise the issue with the trial court. Miller argues the delay was prejudicial because the time delay meant multiple judges ruled on different aspects

of the case. Miller also argues that the lack of any prior judge sanctioning Miller affirms his claim of prejudice in the delay. We do not agree.

It is true that attempting to rely on cold docket sheets, particularly when referencing actions in prior cases, can render it "impossible to discern whether the particular motion was completely meritless, or made for an improper purpose." (*Holcomb*, *supra*, 129 Cal.App.4th at p. 1506.) But that is not the case here. Bernie could rely not just on ultimate rulings listed in a docket, but also on direct evidence in the form of declarations submitted in the pending case and written rulings from the trial court that considered those declarations supporting Bernie's positions. There is also no indication that the trial court in this case was in any worse position than any other court to make the relevant vexatiousness determination. And there is no history of motions for sanctions being denied. (See *ibid.* [court in prior litigation had considered same evidence and rejected vexatious litigant request].) Although Miller notes he has not been previously sanctioned, he points to no law which requires such conduct before the trial court can conclude that a party's overall litigation tactics are frivolous. (See *Shalant*, *supra*, 51 Cal.4th at p. 1176 [" 'Since fewer sanctions are available against a *pro per* litigant, the power to declare him vexatious becomes an important tool for the courts to manage their dockets and prevent frivolous claims.' "].)

Nor is any purported delay in seeking the vexatious litigant ruling inappropriate. Not only does section 391, subdivision (b)(3) "not specify either a timeframe or quantity of actions necessary to support a vexatious litigant finding," but the broader statutory scheme states that a motion can be filed "at any time until final judgment is entered." (*Morton*, *supra*, 156 Cal.App.4th at p. 971; § 391.1.) Moreover, even if delay was a defense, the facts of this case do not imply there was an improper delay. Bernie has filed only one motion seeking relief and has done so in the case in which Miller's conduct occurred. Moreover, Bernie's filing came only after more direct attempts at resolving the alleged underlying fraud in the case were unsuccessful. While Bernie's motion could

19.

have been filed earlier, this court sees no reason why Bernie cannot muster a fuller evidentiary record before filing, particularly where issues of fraud and overall litigation tactics are concerned.

Ultimately, the trial court was in a position to review the full record of the case and weigh the potentially competing evidence regarding whether Miller qualified as a vexatious litigant under the statutory scheme. Although Miller may disagree with the trial court's factual findings, upon review we find no basis to conclude they were unsupported by substantial evidence. Indeed, the record contains a flood of evidence indicating that Miller is exactly the type of litigant that the vexatious litigant statutes seek to control—one that will engage in a decade long litigation founded on multiple attempts to fraudulently obtain a default judgment and containing a multitude of potentially meritless filings. Accordingly, as the trial court is entitled to consider and weigh the evidence presented to it, and we are bound to affirm that balancing if properly supported, we affirm the trial court's vexatious litigant finding and its later issuance of a prefiling order. We next turn to whether the trial court properly imposed a security requirement upon a finding that Miller lacked a reasonable probability of success on the merits.

### Substantial Evidence Supports the Finding of No Reasonable Probability of Success

The trial court determined Miller had no reasonable probability of success on the merits based on its analysis of both legal and factual hurdles facing the case. From a legal standpoint, the court concluded that Miller could not overcome the relevant statute of limitations or certain controlling regulations with respect to his claims for paralegal fees. From a factual standpoint, the court concluded Miller could not demonstrate he ever loaned $1.7 million dollars to Bernie. Relevant to all of these determinations was the court's conclusion that the core evidence Miller submitted with his complaint—a purported letter from Bernie—was fabricated.

The evidence supporting these conclusions was certainly substantial and the legal conclusions the court drew from them were sound. With respect to the paralegal work,

the court pointed to evidence in the record that the alleged paralegal work was completed in 2005 and 2006, but the complaint was not filed until 2012, well beyond the two-year statute of limitations for oral contracts and the four-year statute of limitations for written contracts. (§§ 337, 339.) The court also noted that no evidence presented demonstrated the warden of any of Miller's prisons had granted him permission to engage in business activities. As Bernie notes, without such permission, Miller's alleged contract is unenforceable. (See *Homani v. Iranzadi* (1989) 211 Cal.App.3d 1104, 1109 [" ' "The general principle is well established that a contract founded on an illegal consideration, or which is made for the purpose of furthering any matter or thing prohibited by statute, or to aid or assist any party therein, is void." ' "]; see also *Manning v. Bunnell* (E.D.Cal. May 23, 2013, No. 2:12-cv-2440 MCE AC P) 2013 U.S.Dist. Lexis 74098, 49 ["The undersigned agrees with defendants that because Manning is a prisoner and barred by the regulation from conducting business and profiting from his writing, he can have no legally-enforceable contractual rights or expectation of prospective economic advantage in relation to the publication of his books"].)

With respect to the $1.7 million loan to Bernie, the court pointed to the fact that Miller could not demonstrate he ever had that amount of money, and that the only document implying such funds ever existed was admitted by Miller to be a forgery. The court also pointed to the June 15 phone call purporting to memorialize the debt, noting "there was never a telephone conversation with Lolonis Winery about Mr. Miller investing in this partnership of Lolonis Winery and receiving $1.7 million from Mr. Miller." The failure to have or lend the money would preclude a claim for recovery. (See *Pleasant v. Samuels* (1896) 114 Cal. 34, 36–38 [to state a common count for money lent, the plaintiff need only allege that the defendant is indebted in a certain sum for money loaned by the plaintiff and that the defendant has not repaid the money]; *Pike v. Zadig* (1915) 171 Cal. 273, 276 [to prevail on a common count for money had and

received, the plaintiff must prove that the defendant is indebted to the plaintiff for money the defendant received for the use and benefit of the plaintiff].)

Finally, with respect to all claims, the court noted that the primary evidence Miller relied upon to prove his case was the purported letter from Bernie confirming the debts owed. The court reviewed the evidence submitted regarding that letter and concluded it was a forgery. In doing so, the court pointed to substantial evidence in the record including transcribed phone calls that did not mention the debt, forensic examinations that found Bernie's signature to not be authentic, a comparison of the letter with the Lazarenko proof of service, another perceived forgery, implying both were created by the same person, and evidence explaining how Miller came into possession of the documents needed to forge the letter. All of this evidence was before the trial court and the court's factual findings regarding the weight and veracity of that evidence is well within its discretionary authority. (See *Golin*, *supra*, 190 Cal.App.4th at p. 636 ["Likewise, a court's decision that a vexatious litigant does not have a reasonable chance of success in the action is based on an evaluative judgment in which the court weighs the evidence. If there is any substantial evidence to support the court's determination, it will be upheld."].)

Despite the presence of this evidence, Miller argues the trial court could not weigh the evidence and find Miller lacked a reasonable probability of success. Miller argues that the law of the case, as detailed in the second prior appeal, prevents any factual conclusions that he lacks a reasonable probability of success. Additionally, Miller argues the record in this case shows the trial court abused its discretion by relying upon the overturned order underlying the second appeal in concluding Miller lacked a probability of success. Neither contention is availing.

Under the law of the case doctrine, a decision made by an appellate court in an action binds both trial and appellate courts in subsequent proceedings in that same case. (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.) Thus, "[t]he rule of 'law of the

22.

case' generally precludes multiple appellate review of the same issue in a single case." (*Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434.) "The doctrine, as the name implies, is exclusively concerned with issues of law and not fact." (*People v. Shuey* (1975) 13 Cal.3d 835, 842, overruled on other grounds in *People v. Bennett* (1998) 17 Cal.4th 373, 389–390, fn. 4.)

It is true that a ruling reversing summary judgment based on the existence of a material issue of fact can trigger the law of the case. (See *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309–310, disapproved on other grounds in *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 646.) However, the scope of the doctrine is limited to those legal issues necessarily decided and does not bar subsequent consideration of similar issues under different legal standards. (See *Donohue v. State of California* (1986) 178 Cal.App.3d 795, 801–802 [noting prior determination that issues of fact precluded summary judgment did not prevent court from later granting judgment on the pleadings].)

Miller's arguments in this case seek to apply a standard that views all evidence in the light most favorable to the opposing party and asks whether there are any material issues of fact that must be tried to resolve the case to a situation where the trial court is tasked specifically with weighing competing evidence and determining whether a security is required because the vexatious litigant opposing the motion lacks a reasonable probability of success on the merits. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [describing summary judgment standards].) From the contrasting standards alone, it is clear that any finding Miller has come forward with evidence upon which a claim could be tried does not preclude the trial court from later weighing that evidence under authority granted by the vexatious litigant statutes and concluding it fails to show a reasonable probability of success on the merits. The legal findings in each instance are simply different, meaning the law of the case does not limit the court's authority under these different standards.

Miller's argument fails for the additional reason that this court's prior appellate opinion did not rely upon any conclusion that Miller had satisfied the summary judgment standards. Rather, this court found that the trial court had wrongly circumvented the substantive and procedural safeguards afforded by the summary judgment statutes in order to make factual findings that would not otherwise be appropriate if summary judgment was utilized. The closest this court came to considering the evidence presented in the context of the summary judgment standard was a concluding sentence in that portion of the analysis where we wrote: "Because defendant did not follow the proper procedures for bringing a motion for summary judgment, and because the evidence indicated there were triable issues of material fact, defendant's motion should have been denied." This one sentence recognition of conflicting evidence in the record was not material to the decision given that the trial court's failure to adhere to any aspects of the summary judgment law constituted reversible error and, more importantly, was not a legal conclusion as to the validity of any of the evidence presented by Miller.

Indeed, the entire point of this court's analysis was that no such analysis of conflicting facts could be done under a motion that had to be treated as a request for summary judgment. As such, we find no merit in Miller's assertion that this court previously implicitly or explicitly ruled a trial is necessary to determine for all purposes whether the statute of limitations applies, certain regulations preclude recovery, or Miller's core documents are fabricated. Nor do we find merit in Miller's claim that Bernie was required to present new evidence, not presented during the improperly conducted summary judgment proceedings, to prevail. Rather, this court merely held that the trial court could not make factual findings in the course of a motion that had to be analyzed under the summary judgment rubric. Whether such an analysis could be triggered by separate statutory authority was not before us, and we see no reason why an issue of fact precluding summary judgment would bar a court from later considering

24.

whether one properly deemed a vexatious litigant had a reasonable probability of success on the merits.

In a partially related argument, Miller contends the trial court abused its discretion by relying on the order reversed in the second appeal in order to determine Miller lacked a reasonable probability of success on the merits. Although Miller claims the trial judge "is entitled to the 'presumption' that she properly performed her duties without bias," he claims this presumption is overcome by the fact the trial court was provided with a copy of the prior motion in the briefing and made similar factual findings. We do not agree. Nothing in the record suggests the trial judge disregarded her duties. Rather, it is apparent that substantial thought and consideration went into the court's ruling. Regardless, this court reviews the judgment, not the court's reasoning, upon appeal. (See *Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 769–770.) As discussed extensively above, the record contains substantial evidence supporting the court's findings independent of any information contained in the contested order.

***Motions for Judicial Notice and Sanctions***

In the course of briefing this appeal, Miller filed two motions, one for judicial notice and one for sanctions against Bernie. We deny both motions.

Miller's motion for judicial notice requests this court take judicial notice of multiple appellate and trial court documents and the unpublished appellate opinion from a case called *Semendinger v. California Department of Corrections and Rehabilitations* (January 31, 2012, F060472 [2012 Cal.App.Unpub. LEXIS 814]). Miller argues that proofs of service used in that case are substantially similar to the Lazarenko proof submitted in this case and that this similarity arises because Miller sent exemplars from that case to Lazarenko. There is no dispute that these documents were not presented to the trial court. Accordingly, we deny the request for judicial notice. (See *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 366–367 [courts need not take judicial notice of late discovered documents that could impeach or discredit a

25.

witness].)  The documents are not relevant to the issues on appeal, namely whether substantial evidence supported the trial court's ruling.

Miller's motion for sanctions asks this court to utilize its inherent authority to penalize Bernie and his counsel for alleged "bad faith tactics" which include the nonstatutory speaking motion reversed in the second appeal and the present vexatious litigant motion, which Miller alleges violates the law of the case.  Assuming this court has authority to issue sanctions, we find no basis to do so.  Miller obtained a sufficient remedy in the prior appeal and Bernie's filing of the vexatious litigant request has been affirmed in this appeal.

## DISPOSITION

The judgment is affirmed.  Miller's "Motion for Judicial Notice," filed March 11, 2021, is DENIED.  Miller's "Motion for Issue, Evidence, or Monetary Sanctions," filed April 13, 2021, is DENIED.  Costs are awarded to Bernie.


HILL, P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.